# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 20, 2013

## NEWT CARTER v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C-11-282    Roy Morgan, Jr., Judge**

---

**No.  W2013-00506-CCA-R3-PC  -  Filed April 25, 2014**

---

A Madison County jury convicted Petitioner, Newt Carter, of aggravated rape and aggravated burglary.  He received an effective sentence of twenty years to be served at 100 percent incarceration for the aggravated rape to be served consecutively to five years to be served at thirty percent incarceration for the aggravated burglary. *State v. Newt Carter*, No. W2009-00600-CCA-R3-CD, 2010 WL 2349207, at *1 (Tenn. Crim. App., at Jackson, June 11, 2010), *perm. app. denied*, (Tenn. Nov. 12, 2010).  Petitioner filed a petition for post-conviction relief.  After holding evidentiary hearings on the petition, the post-conviction court denied the petition.  Petitioner appeals the denial of the petition and argues that he was afforded ineffective assistance of counsel.  We have reviewed the record on appeal and conclude that the post-conviction court correctly denied the petition.  Therefore, we affirm the denial of the petition for post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed..**

JERRY L. SMITH, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and D. KELLY THOMAS, JR., JJ., joined.

Joseph T. Howell, Jackson, Tennessee, for the appellant, Newt Carter.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Jerry Woodall, District Attorney General, and Jody Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Factual Background*

Petitioner was convicted of the aggravated burglary and the aggravated rape of his girlfriend's mother. The following facts were recited by this Court on direct appeal:

> At 5:00 a.m., the victim awoke to a man tapping her temple with a gun. The man wore a stocking cap over his face and was otherwise naked. He whispered to her to "drop 'em." When she hesitated to remove her clothes, he told her to "[h]urry up." She did not recognize his voice, and she could not tell what race the man was. She removed her clothes, and the man instructed her to lie down on the bed. He fondled her breast and moved his hand between her legs. Then, he told her to "suck it." She performed oral sex on him until he told her to get on her knees on the bed. The victim testified that he penetrated her vagina with his penis. She was unable to tell whether he wore a condom. After approximately five minutes, he stopped and laid down, ordering her to get on top of him. He penetrated her again. The victim said that after he was finished, he ordered her to clean up. Throughout the rape, he pointed the gun at her head. She went into her bathroom and washed her vaginal area. The victim testified that she was able to see at that point that the man was dark-skinned and five feet, ten inches, tall. He told her to "[g]et on up in there[,]" and she complied by washing the interior of her vaginal area with a washcloth. While she washed, the man ran downstairs and out the back door. She waited before she went downstairs and locked the door.
>
> After she locked the door, she returned upstairs and began calling her daughter. She heard a noise at her window and shut off her phone before completing the call. The victim said that she took a bat out of her bedroom closet and stood in her room until she gathered the courage to call her daughter. When she called, her daughter answered the phone, but the defendant "grabbed the phone." She told him what happened to her. He arrived at her apartment, letting himself in with a key. The victim said that she was unsure what time the police arrived because she was hysterical. The police took her to the emergency room, where hospital personnel examined her utilizing a rape kit, which involved taking her blood and examining her genital area. The victim testified that she had known the defendant for six years. She had never had a sexual relationship with him.

. . . .

On redirect examination, the victim testified that she began to suspect the defendant "because he was acting funny, and he said, 'They can't get me . . . . They can't get me for that.'"

. . . .

Jackson Police Investigator Danielle Jones testified that she first met the victim at the hospital on July 1, 2006. Later on the same day, she spoke with the defendant. She considered him to be a possible witness because he was the last person to have contact with the victim, he was the first person on the scene after the rape, and the responding officers considered his behavior to be suspicious. Investigator Jones obtained a DNA sample from the defendant by swabbing the inside of his cheeks. She sent the victim's sexual assault kit and the defendant's oral swabs to the Tennessee Bureau of Investigation ("TBI") laboratory in Nashville for comparison. She said the victim gave her a "supplemental description" that her assailant was dark-skinned and five feet, ten inches tall.

. . . .

Sara Shields, a DNA analyst at Bode Technology, testified that she analyzed the evidence received from the TBI regarding this case. She used the victim's blood sample and the defendant's oral swabs to create DNA profiles for comparison to the evidence. Ms. Shields testified that the victim's vaginal swab, her panties, the towel, and the bedsheets contained two DNA profiles, that of the victim and that of the defendant. She testified that the possibility that any person was the source of the male DNA profile, other than the defendant, exceeded the current world population.

. . . .

The defendant testified that he did not rape the victim nor did he enter her home without permission. He said that between 10:00 a.m. and 11:00 a.m., on June 30, 2006, he had consensual sex with the victim at her apartment. He did not use a condom, and afterwards, he washed with a towel in her bathroom. The defendant testified that he and the victim had been in an ongoing sexual relationship since he graduated from high school. . . . The defendant said that

he cooperated with the police in their investigation by giving his consent for them to take his DNA and answering all of their questions.

. . . .

Following deliberations, the jury found the defendant guilty as charged of aggravated rape, a Class A felony, and aggravated burglary, a Class C felony.

*Newt Carter*, 2010 WL 2349207, at *1-6.

The trial court sentenced Petitioner as a Range I, standard offender to twenty years to be served at 100 percent for the aggravated rape to be served consecutively to five years at thirty percent for the aggravated burglary. *Id*. at *1.

On November 1, 2011, Petitioner filed a pro se petition for post-conviction relief. The post-conviction court appointed counsel and an amended petition was filed. The post-conviction court held an evidentiary hearing on March 12, 2012. This Court summarized the proceedings in the following manner:

At the post-conviction hearing, the Petitioner testified that he only met with his retained trial counsel once outside of court prior to trial. According to the Petitioner, trial counsel's discussions with him consisted of her assurance that they "could beat" the charges under a theory of consensual sex. He requested that trial counsel employ the services of a DNA expert in order to explain why his DNA was found around the victim's residence. On cross-examination, the Petitioner clarified that, although the expert still would find his semen, he believed the expert also would find his DNA all over the victim's residence. For example, he believed that the expert would find his DNA on a toothbrush and other various items, which would infer the Petitioner's ongoing consensual sexual relationship with the victim.

The Petitioner stated that he graduated from high school but that he had learning disabilities and attended "resource classes" and Pathways. He testified that he had informed trial counsel about his learning disabilities prior to going to trial because he felt that he was incapable to take the stand at trial. However, on cross-examination, the Petitioner acknowledged that he

previously had pleaded guilty to other criminal offenses and that he had no trouble understanding the process.

The Petitioner also informed trial counsel that he did not rape the victim because he was at home with the victim's daughter, T.H.[1], at the time of the rape. He stated that he and the victim had been arguing on the morning of the rape because he did not want anyone to know that he was having consensual sex with the victim. However, the Petitioner and trial counsel never discussed, and trial counsel never asked, whether anyone could offer testimony to corroborate the Petitioner's story. The Petitioner stated that an individual named Benjamin Jackson knew about the Petitioner's relationship with the victim but that the Petitioner did not tell trial counsel about Jackson.

The Petitioner also asserted that he wished trial counsel would have gone further in her cross-examination of T.H. during the trial. Specifically, he wanted trial counsel to ask more questions regarding T.H.'s testimony that she was intoxicated. The Petitioner believed that T.H. still would have noticed had he gotten up during the night because, at the time, they had a newborn baby. However, when asked whether the Petitioner would have asked any questions that trial counsel did not ask, the Petitioner responded, "No, sir."

The Petitioner also believed that trial counsel should have cross-examined the victim further regarding her statements to the detective and police officer concerning her description of the assailant. He thought that the victim's descriptions were inconsistent. The Petitioner also wanted trial counsel to cross-examine Officer Brooks regarding his testimony concerning a window at the victim's residence. He believed that Officer Brooks' testimony about the existence of a screen on the window was untrue. However, he agreed that Officer Franklin testified regarding the discrepancy as to the presence of the screen.

The Petitioner's last contention was that trial counsel should have filed a motion pursuant to Tennessee Rule of Evidence 412 so that trial counsel could have questioned the victim regarding her sexual behavior. However, on cross-examination, the Petitioner agreed that he testified to these facts in his testimony.

---

[1]We will refer to the victim's daughter by her initials in order to protect the privacy of the victim.

Benjamin Jackson, the Petitioner's first cousin, testified that, in 2006, he was aware that the Petitioner was involved in a relationship with T.H. and with her mother, the victim. He knew about the victim and the Petitioner's relationship because, on one occasion, he walked in on the two of them having sexual intercourse. Jackson would have been willing to testify to these facts at trial, but no one ever asked him about what he knew.

On cross-examination, Jackson agreed that the Petitioner saw Jackson walk in on the victim and the Petitioner but stated that the victim did not see him. He also acknowledged that, when the Petitioner was charged with rape, Jackson did not discuss his knowledge with the Petitioner until both of them were in a penitentiary together in Whiteville five years later. He stated that the Petitioner asked him to come forward and testify to this information at the post-conviction hearing.

Gwendolyn Cooper, the Petitioner's mother, testified that the Petitioner was enrolled in resource classes in high school because he had dyslexia, Attention Deficit Disorder ("ADD"), and Attention Deficit-Hyperactivity Disorder ("ADHD"). He received treatment for these learning disabilities at Pathways.

Cooper stated that she retained and paid for the Petitioner's trial counsel. She met with trial counsel on three occasions in trial counsel's office along with T.H.. T.H. told trial counsel in those discussions that the Petitioner was with her the whole night on the evening of the alleged rape of the victim. Cooper did not remember telling trial counsel about the Petitioner's learning disabilities.

T.H. testified that she has had four children with the Petitioner. She remembered telling trial counsel that the Petitioner did not leave her house on the night of the alleged rape. She explained that her testimony changed at trial because she did not want to perjure herself. According to T.H., she originally lied to trial counsel in order to protect the Petitioner, but she changed her mind when thinking about her children.

*Newt Carter v. State*, No. W2012-00508-CCA-R3-PC, 2012 WL 6588656, at *1-3 (Tenn. Crim. App., at Jackson, Dec. 14, 2012). Then the following occurred:

At the conclusion of the Petitioner's proof at the post-conviction hearing, the State requested, "Your Honor, at this time the State is going to make the motion for directed verdict or motion for summary judgment – well, motion for directed verdict." The transcript indicates immediately following the State's request that "[t]here were arguments made on behalf of the State and the Petitioner, and the Court ruled as follows." According to the record, the post-conviction court then denied the Petitioner post-conviction relief.

*Newt Carter*, 2012 WL 6588656, at *4. Petitioner appealed the denial of his petition to this Court. *Id.* at *1. Upon review of the record, this Court determined that there was nothing in the Post-conviction Procedure Act and Rule 28 of the Rules of Tennessee Supreme Court to provide for a directed verdict or summary judgment in a post-conviction proceeding. *Id.* at *5. Consequently, this Court vacated the post-conviction court's judgment and remanded "for the conclusion of the evidentiary hearing." *Id.*

On February 11, 2013, the post-conviction court held a hearing upon remand. The State presented proof. Trial counsel was the State's only witness. She testified that her primary practice area is criminal defense. At the time of the hearing, she had been in practice for about ten years. She had handled four to five hundred criminal cases and twenty jury trials.

Trial counsel was retained to represent Petitioner. She testified that she met with Petitioner four times to discuss his case, review the discovery, and talk about potential witnesses. She denied Petitioner's assertion that they met only one time. She said she also met with him at his court appearances. Trial counsel also stated that she met several times with Petitioner's mother to discuss the case. She said she attended the first post-conviction hearing.

Trial counsel testified that her trial strategy changed throughout her representation of Petitioner because Petitioner's version of events changed. Initially, Petitioner told trial counsel that he did not know how his DNA could be found inside the victim's body. Subsequently, he told trial counsel that he and the victim had been in a consensual sexual relationship for years. Trial counsel stated that the need for a DNA expert was not necessary given the fact that Petitioner decided to testify at trial and admit that he had sexual intercourse with the victim.

With regard to Petitioner's witness, Benjamin Jackson, trial counsel stated that Petitioner never proposed him as a witness. She stated that the first time she heard of him was at the first post-conviction hearing. Trial counsel said that, after Petitioner stated he had

a consensual, sexual relationship with the victim, she specifically asked him if there was a witness who could corroborate his claim. Petitioner told trial counsel that he and the victim were the only people who knew of the relationship.

Trial counsel stated that she did not see any issues with Petitioner's mental abilities. She stated that she had represented him before when he was younger and his understanding of the criminal justice system increased with age and experience. She stated that they did not have any communication problems. Trial counsel also stated that Petitioner's mother did not express any concerns with Petitioner's mental health or abilities.

Trial counsel stated that initially, the victim's daughter stated that Petitioner could not have committed the crime because he was sleeping with her at their house. However, her story changed at trial. At trial, the victim's daughter testified that Petitioner could have left while she was asleep. Trial counsel spoke with the victim's daughter after the trial and asked why she had changed her story. The victim's daughter stated that she felt that she needed to protect Petitioner so that his mother would help her care for her children of whom Petitioner was the father. Later, she decided it would be worse for her to go to jail for perjury.

At the conclusion of the hearing, the post-conviction court denied the petition. The post-conviction court filed an order denying the petition and included the following findings of fact:

1.  The Petitioner has failed to demonstrate how any alleged mental health issues from which he may have suffered would have been relevant at the trial of this matter and how the failure to raise any mental health issues was evidence of defense counsel being ineffective.

2.  The Petitioner has failed to demonstrate how the manner in which certain witnesses were cross-examined deprived him from the effective assistance of counsel.

3.  The Petitioner has failed to demonstrate how the failure of defense counsel to move for certain evidence be admitted under Tennessee Rule of Evidence 412, prevented him from the effective assistance of counsel. Specifically, the Court finds that evidence that would have been the subject of a motion under T.R.E. 412 was presented to the jury by various witnesses including the Defendant through his testimony.

4.  The Petitioner has failed to demonstrate how the failure of defense counsel to secure the services of a DNA expert, prevented him from the effective assistance of counsel. Specifically, the Court finds that the evidence that a DNA expert would presumably provide, was presented at trial. The Petitioner asserted that a DNA expert would have offered an explanation of how his DNA would have been found at various locations including on/in the body of the victim as a result of them having an alleged sexual relationship for some time. This evidence was presented at trial by the Petitioner at his trial by his own testimony and the same was rejected by the trier of fact.

5.  The Petitioner has failed to demonstrate how the manner that defense counsel approached testimony concerning a window screen found at the scene, prevented him from effective assistance of counsel.

6.  The issue raised by the Petitioner concerning the failure of defense counsel to file a Motion for New Trial is moot as the Petitioner was granted a delayed appeal following a motion for new trial.

7.  The testimony of Benjamin Jackson concerning him supposedly being a witness to a sexual encounter between the Petitioner and the victim, is not new evidence because Petitioner was aware of the possibility of Jackson being called as a witness at the time of trial.

8.  Defense counsel sufficiently conferred with the Petitioner prior to trial.

9.  The Petitioner has failed to establish that he was incapable in assisting in his own defense or incapable of understanding the legal process.

10. The Petitioner lacks credibility and the Court credits the testimony of defense counsel.

Petitioner filed a timely notice of appeal.

## **ANALYSIS**

Petitioner argues on appeal that the post-conviction court erred in denying his petition for post-conviction relief because he was denied effective assistance of counsel. The State disagrees.

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issues raised, we will afford those findings of fact the weight of a jury verdict, and this Court is bound by the post-conviction court's findings unless the evidence in the record preponderates against those findings. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *Alley v. State*, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This Court may not re-weigh or re-evaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. *See State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient and (b) that the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In order to demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).

As noted above, this Court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. *See id.* at 578. However, our supreme court has "determined that issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . . ; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *Burns*, 6 S.W.3d at 461.

Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. 1994). This Court may not second-guess a reasonably-based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the course of the proceedings. *See id.* However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Initially, we state that we are taking judicial notice of the testimony presented in the first post-conviction hearing. The post-conviction court relied upon the testimony from both the first and second post-conviction hearings in denying the petition.

In his brief, Petitioner sets out this Court's standard of review and the law governing review of ineffective assistance of counsel claims. Petitioner next summarizes the testimony presented at the second post-conviction hearing. He concludes with the following argument, in its entirety:

> Petitioner respectfully submits trial counsel's representation [fell] below the range of competence demanded of attorneys in criminal cases. Consequently, the Petitioner was deprived of his right to present a defense to the charges lodged against him. Next, the Petitioner claims that this deficient performance on the part of the trial counsel resulted in prejudice to him.

> Accordingly, Petitioner respectfully submits that due to trial's [sic] counsel deficient performance, he has been denied effective assistance of counsel and has been prejudiced because of it as set forth herein.

Petitioner has not set forth any argument as to specifically how trial counsel's representation was deficient or how such alleged deficiency resulted in prejudice.

After a review of the record, we conclude that Petitioner has not met both the prongs set out in *Strickland* and that the evidence in the record does not preponderate against the findings of the post-conviction court. Initially, we point out that the post-conviction court specifically found trial counsel's testimony to be credible.

As shown in the record on appeal, trial counsel met with both Petitioner and his mother multiple times regarding Petitioner's case. Petitioner and his mother did not inform trial counsel of any issues with regard to Petitioner's mental abilities, and trial counsel testified that she did not notice any issues with Petitioner's mental abilities. Petitioner testified that he understood the criminal process. Trial counsel stated that her strategy had to change as Petitioner's story changed. When Petitioner told her that he was having consensual, sexual relations with the victim, there was no longer a need for a DNA expert to testify as to alternate ways that Petitioner's DNA could be present at the scene. Jackson testified at the first post-conviction hearing that he saw Petitioner and the victim engaging in sexual relations. He stated that Petitioner saw him when he walked into the room. Petitioner also stated that he knew Jackson could be a witness to corroborate his version of

events. However, Petitioner stated that he failed to inform trial counsel that Jackson could be a witness. Trial counsel testified that she specifically asked for a witness to corroborate his relationship with the victim, but Petitioner told her that there was no witness available. Trial counsel stated that T.H. changed her testimony from when they met in trial counsel's office to when she testified at trial. When she spoke with T.H. after trial, she said that she felt pressure to support Petitioner because his mother would not help her with her children that were Petitioner's children. However, when T.H. got closer to trial she was afraid of what would happen if she perjured herself. This evidence supports the conclusions of the trial court. There is no evidence of deficient performance on the part of trial counsel. Furthermore, Petitioner has failed to present any evidence to show prejudice.

Therefore, this issue is without merit.

## **CONCLUSION**

For the foregoing reasons, we affirm the post-conviction court's denial of the petition for post-conviction relief.

_____
JERRY L. SMITH, JUDGE